## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| CARA CHIAPPA and DAN ALFONSO, individually and on behalf of all others similarly situated, | Case No.: |
| Plaintiffs, | CLASS ACTION COMPLAINT |
| v. | |
| CUMULUS MEDIA, INC., and JOHN DOES 1-10., | <u>DEMAND FOR JURY TRIAL</u> |
| Defendants. | |

Plaintiffs Cara Chiappa and Dan Alfonso ("Plaintiffs"), by and through their attorneys, on behalf of the Cumulus Media 401(k) Plan (formerly the Cumulus Media, Inc. 401(k) Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

## I.    INTRODUCTION

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Cumulus Media, Inc. (a.k.a Cumulus Radio Corporation)[2] ("Cumulus" or the "Company") and any individuals who may have been appointed by the Company to serve as Plan fiduciaries during the Class Period for breaches of their fiduciary duties.

---

[1] The Plan is a legal entity that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).  However, in a breach of fiduciary duty action such as this, the Plan is not a party.  Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

[2]  The Company is defined herein to mean "Cumulus Media, Inc." and "Cumulus Radio Corporation" interchangeably.   The Plan's operative Summary Plan Description ("SPD" at 1) states "The name and address of your Employer is: Cumulus Radio Corporation, 3280 Peachtree Road NW, Suite 2200, Atlanta, Ga 30305."  On the other hand, the Plan's 2017 Form 5500 filed with the Department of Labor states the Plan is sponsored by Cumulus Media, Inc.  *See* 2017 Form 5500 at 1.

2.     Defined contribution retirement plans, like the Plan, confer tax benefits on participating employees to incentivize saving for retirement.  As of the end of 2015, Americans had approximately $6.7 trillion in assets invested in defined contribution plans.  *See* INVESTMENT COMPANY INSTITUTE, *Retirement Assets Total $24.0 Trillion in Fourth Quarter 2015* (Mar. 24, 2016), available at https://www.ici.org/research/stats/retirement/ret_15_q4;  PLAN SPONSOR, *2015 Recordkeeping Survey* (June 2015), available at http://www.plansponsor.com/2015-Recordkeeping-Survey/.

3.     In a defined contribution plan, participants' benefits "are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses."  *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1826 (2015).  Thus, the employer has no incentive to keep costs low or to closely monitor the Plan to ensure every investment remains prudent, because all risks related to high fees and poorly-performing investments are borne by the participants.

4.     To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. 29 U.S.C. § 1104(a)(1).  These twin fiduciary duties are "the highest known to the law."  *ITPE Pension Fund v. Hall*, 334 F.3d 1011, 1013 (11th Cir. 2003); *Pledger v.*

*Reliance Trust Co.*, 240 F. Supp. 3d 1314, 1321 (N.D. Ga. 2017).  Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope.  29 U.S.C. § 1104(a)(1)(B).

5.     The Plan has nearly two-hundred million dollars in assets that are entrusted to the care of the Plan's fiduciaries.  The Plan's assets under management qualify it as a large plan in the defined contribution plan marketplace, and among the largest plans in the United States.  BrightScope conducted a study in 2015 of a "sample of nearly 53,000 *large* private-sector 401(k) plans—plans with at least $1 million in plan assets and typically 100 participants or more in 2015."[3]  As a large

_____

[3] *See* BrightScope/ICI Defined Contribution Plan Profile: *A Close Look at 401(k) Plans, 2015* at 69 (March 2018) (hereafter, "ICI Study"), available at: https://www.ici.org/pdf/ppr_18_dcplan_profile_401k.pdf.   According to the ICI study:

> The BrightScope/ICI Defined Contribution Plan Profile is a collaborative research effort between BrightScope and the Investment Company Institute that analyzes plan-level data gathered from audited Form 5500 filings of private-sector defined contribution (DC) plans, providing unique, new insights into private-sector DC plan design. The research draws from information collected in the BrightScope Defined Contribution Plan Database. The database is designed to shed light on DC plan design across many dimensions, including the number and type of investment options offered; the presence and design of employer contributions; the types of recordkeepers used by DC plans; and changes to plan design over time. In addition, industrywide fee

plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments. Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent.

6.     Plaintiffs allege that during the putative Class Period (February 24, 2014 through the date of judgment), Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; and (2) maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs and/or better performance histories.

7.     To make matters worse, Defendants failed to utilize the lowest cost share class for many of the mutual funds within the Plan, and failed to consider collective trusts, commingled accounts, or separate accounts (at least for the majority

---

information is matched to investments in DC plans, allowing analysis of the cost of DC plans. The BrightScope/ICI Defined Contribution Plan Profile supplements existing plan sponsor surveys and research based on recordkept data, and it is designed to increase public understanding in this critical area of retirement savings.

of the Class Period) as alternatives to the mutual funds in the Plan, despite their lower fees.

8.      It appears that in late 2019, after purported consultation with Sageview Advisory Group, almost *six years* into the Class Period, wholesale changes were made to the Plan.  Effective November 12, 2019, certain investment options offered through the Plan were no longer offered.  Also, effective November 12, 2019, the share classes of four investment options offered through the Plan were changed.  *See* September 2019 letter to participants from Fidelity Investments.  The new share classes offered participants the same investment strategy and risk, but the overall expenses were lowered.  Further, the Plan participants were told that beginning on December 1, 2019, quarterly revenue credits "may be allocated to your account based on the investments you hold during the prior quarter."  *See* September 2019 letter to participants from Fidelity Investments.

9.      These changes were far too little and too late as the damages suffered by Plan participants to that point had already been baked in.  There is no reason to not have implemented these changes by the start of the Class Period.  Moreover, these changes may not have cured the Company's fiduciary breaches because there is no evidence that at any time during the Class Period, the Company undertook a standardized, routine, critical review of the Plan investment options—*i.e.*, it did not

undertake a prudent process in evaluating the Plan's investment options. As part of its investigation of this action, Plaintiffs requested pursuant to ERISA § 104(b), operative Plan governing documents. The documents received by Plaintiffs did not indicate the existence of an investment policy statement or the existence of any committee appointed to monitor the Plan's investment options on a periodic basis.

10.    Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duties of prudence and loyalty, in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

11.    Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duties of loyalty and prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II.    JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

13.    This Court has personal jurisdiction over Defendants because they are headquartered and transact business in this District, reside in this District, and/or have

significant contacts with this District, and because ERISA provides for nationwide service of process.

14.    Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

### III.    PARTIES

**A.    <u>Plaintiffs</u>**

15.    Plaintiff Cara Chiappa ("Chiappa") resides in Newtown, Connecticut. During her employment, Plaintiff Chiappa participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

16.    Plaintiff Dan Alfonso ("Alfonso") resides in West New York, New Jersey.  During his employment, Plaintiff Alfonso participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

17.    Each Plaintiff has standing to bring this action on behalf of the Plan because each of them participated in the Plan and were injured by Defendants' unlawful conduct.  Plaintiffs are entitled to receive benefits in the amount of the

difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

18.     Plaintiffs did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized plans, total cost comparisons to similarly-sized plans, information regarding other available share classes, and information regarding the availability and pricing of separate accounts and collective trusts) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.  Further, Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing Plan investments, because this information is solely within the possession of Defendants prior to discovery.  Having never managed a large plan such as the Plan, Plaintiffs lacked actual knowledge of reasonable fee levels and prudent alternatives available to such plans.  Plaintiffs did not and could not review the Plan's investment committee meeting minutes or other evidence of

Defendants' fiduciary decision making, or the lack thereof.[4]  For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth herein.

## B.   Defendants

### 1.   Company Defendant

19.   Cumulus is the Plan sponsor.  *See* 2018 Form 5500 at 1.  According to its website, Cumulus "is a leading audio-first media and entertainment company delivering premium content to over a quarter billion people every month."  Further, it "engages listeners with high-quality local programming through 428 owned-and-operated stations across 87 markets; delivers nationally-syndicated sports, news, talk, and entertainment programming from iconic brands including the NFL, the NCAA, the Masters, the Olympics, the Academy of Country Music Awards, and many other world-class partners across nearly 8,000 affiliated stations through Westwood One,

---

[4] In fact, based on Plan documents that Plaintiffs have received, and their counsel reviewed, it does not even appear that an investment committee was appointed to oversee the selection and monitoring of the Plan's investment options.  Nonetheless, several weeks prior to filing the instant lawsuit, Plaintiffs requested that the Plan administrator produce meeting minutes of the relevant Plan investment committee(s), but their request was denied.

the largest audio network in America."[5]  Cumulus is incorporated in Delaware and has its principal place of business in Atlanta, Georgia.

20.     The Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) for several reasons.

21.     First, it is a named fiduciary under the Plan.  The SPD defines the Plan Administrator as Cumulus Radio Corporation.  *Id*. at 3.  *See also* Volume Submitter Defined Contribution Plan, Fidelity Basic Plan Document No. 17 ("Plan Document") at 1.  The Plan Document further states "[t]he Administrator, ***as named fiduciary for the Plan***, may appoint one or more investment managers (as defined under Section 3(38) of ERISA) who may have such duties, up to and including any authority to determine what shall be the Permissible Investments for the Plan at any given time, what restrictions will exist upon those and how unallocated accounts under the Plan and contributions described in Section 8.02(b)(2) of the Plan shall be invested, as the Administrator in its sole discretion shall determine in its appointment and agreement with such investment manager(s)."  *Id*. at 34.

22.     Second, during the Class Period, Cumulus exercised discretionary authority and control over Plan management and/or authority or control over

---

[5] https://www.cumulusmedia.com/

management or disposition of Plan assets as the Plan Administrator. For example, the September 2019 letter to Plan participants referenced above, states that "Cumulus Radio Corporation **has decided** to make the following changes to the Plan's investment lineup." *Id.* at 1 (emphasis added).

23.    Third, because Cumulus had the power to appoint "one or more investment managers" it is also a fiduciary in this regard. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

### 2.    Additional John Doe Defendants

24.    To the extent that there are additional officers and employees of Cumulus who are/were fiduciaries of the Plan during the Class Period, or were hired or appointed as an investment manager for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 1-10 include, but are not limited to, Cumulus officers and employees who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## IV.   THE PLAN

25.     The Plan was initially established on January 1, 1998.  *See* Financial Statements and Independent Auditor's Report, for the Year Ended December 31, 2017 ("Auditor's Report") at 6.  "The purpose of the Plan is to enable eligible Employees to save for retirement."  SPD at 1.

26.     The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account.  Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

### A.     Eligibility

27.     "The Plan covers all employees of [Cumulus] who are at least 21 years of age and have 2 months of service, excluding leased employees, nonresident aliens, and those covered under a collective bargaining agreement unless required otherwise by the agreement."  Auditor's Report at 6.  Further, "[e]mployees are eligible to enter the Plan on the 1st day of each Plan year and the 1st day of the month after meeting the eligibility requirements."  *Id.*

13

**B.**    **Contributions**

28.    There are several types of contributions that can be added to a participant's account: an employee salary deferral contribution, an employer matching contribution, and distributions from other qualified defined benefit or defined contribution plans (rollovers).  *Id.* at 6.

29.    With regard to employee contributions, "participants may contribute up to 70% of annual compensation."  *Id.*

30.    "The Company may make discretionary matching contributions to the Plan.  For the year ended December 31, 2017, matching contributions were 25% up to 6% of a participant's deferred compensation."  *Id.*

31.    Like other companies that sponsor 401(k) plans for their employees, Cumulus enjoys both direct and indirect benefits by providing matching contributions to Plan participants.  Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made.  *See generally* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

32.    Additionally, it is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover."  *See* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

33.     Given the size of the Plan, Cumulus likely enjoyed a significant tax and cost savings from offering a match.

**C.     Vesting**

34.     A participant is 100 percent vested at all times in their "contributions plus actual earnings or losses thereon."  Auditor's Report at 7.

35.     "Vesting in the company's contribution portion" of a Plan participant's account is based on the following schedule:

| Years of Service | Percent Vested |
|---|---|
| Less than 1 | 0% |
| 1 | 20 |
| 2 | 40 |
| 3 | 60 |
| 4 | 80 |
| 5 or more | 100 |

*Id*.

**D.     The Plan's Investments**

36.     Several funds were available to Plan participants for investment each year during the putative Class Period.  As noted above, the Company decides which investment options are offered to participants.  As of December 31, 2017, the Plan offered 31 investment options, including 10 target date funds.

37. The Plan's assets under management for all funds as of January 1, 2018 was $185,306,087. *See* Summary Annual Report 1. As of December 31, 2018, the value of Plan assets was $177,478,194.

## V. CLASS ACTION ALLEGATIONS

38. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[6]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between February 24, 2014 through the date of judgment (the "Class Period").[7]

39. The members of the Class are so numerous that joinder of all members is impractical. The 2018 Form 5500 filed with the U.S. Department of Labor lists 5,230 Plan "participants with account balances as of the end of the plan year." *Id*. at 3.

40. Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and have suffered

---

[6] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

[7] Plaintiffs reserve their right to seek modification of the close of the Class Period in the event that further investigation/discovery reveals a more appropriate end period.

injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

41.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

A.     Whether Defendant is a fiduciary of the Plan;

B.     Whether Defendant breached its fiduciary duties of loyalty and prudence by engaging in the conduct described herein;

C.     Whether the Defendant failed to adequately monitor other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D.     The proper form of equitable and injunctive relief; and

E.     The proper measure of monetary relief.

42.     Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the

Class.  Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

43.     This action may be properly certified under Rule 23(b)(1).  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

44.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## VI.    DEFENDANTS' FIDUCIARY STATUS AND OVERVIEW OF FIDUCIARY DUTIES

45.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan."  ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

46.    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions.  Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."  ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

47.    As described in the Parties section above, Defendant was a fiduciary of the Plan because:

      (a)    it was so named; and/or

      (b)    it exercised authority or control respecting management or disposition of the Plan's assets; and/or

      (c)    it exercised discretionary authority or discretionary control respecting management of the Plan; and/or

      (d)    it had discretionary authority or discretionary responsibility in the administration of the Plan.

48.    As a fiduciary, Defendant is/was required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan, and the Plan's

investments, solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  These twin duties are referred to as the duties of loyalty and prudence and are "the highest known to law." *ITPE Pension Fund v. Hall*, 334 F.3d 1011, 1013 (11th Cir. 2003).

49.    The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants.  *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons."  *Pegram*, 530 U.S. at 224 (quotation marks and citations omitted).  Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating to the interests of plan participants and beneficiaries . . . .  A decision to make an investment may not be influenced by [other] factors unless the investment, when judged *solely* on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan."  *Dep't of Labor ERISA Adv. Op. 88-16A*, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added).

50.     In effect, the duty of loyalty includes a mandate that the fiduciary display complete loyalty to the beneficiaries and set aside the consideration of third persons.

51.     ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble*, 135 S. Ct. at 1828 (2015).  "[A] fiduciary cannot free himself from his duty to act as a prudent man simply by arguing that other funds . . . could theoretically, in combination, create a prudent portfolio." *In re Amer. Int'l Grp., Inc. ERISA Litig. II*, No. 08-cv-5722, 2011 WL 1226459, at *4 (S.D.N.Y. Mar. 31, 2011) (quoting *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3, 423-24 (4th Cir. 2007)).

52.     In addition, ERISA § 405(a), 29 U.S.C. § 1105(a) (entitled "Liability for breach by co-fiduciary") further provides that:

> [I]n addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (2) if,

by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

53.     During the Class Period, Defendant did not act in the best interests of the Plan participants.  Investment fund options chosen for a plan should not favor the fund provider over the plan's participants.  Yet, here, to the detriment of the Plan and its participants and beneficiaries, the Plan's fiduciaries included and retained in the Plan many mutual fund investments that were more expensive than necessary and otherwise were not justified on the basis of their economic value to the Plan.

54.     Based on reasonable inferences from the facts set forth in this Complaint, during the Class Period Defendant failed to have a proper system of review in place to ensure that participants in the Plan were being charged appropriate and reasonable fees for the Plan's investment options.  Additionally, Defendant failed to leverage the size of the Plan to negotiate lower expense ratios for certain investment options maintained and/or added to the Plan during the Class Period.

55.     As discussed below, Defendant breached fiduciary duties to the Plan and its participants and beneficiaries and is liable for its breaches and the breaches of its co-fiduciaries under 29 U.S.C. § 1104(a)(1) and 1105(a).

## VII. SPECIFIC ALLEGATIONS

**A.** **Improper Management of an Employee Retirement Plan Can Cost the Plan's Participants Millions in Savings**

56.     Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must provide diversified investment options for a defined-contribution plan while also giving substantial consideration to the cost of those options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA") § 7.

57.     "The Restatement . . . instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. Dec. 30, 2016) (*en banc*) (quoting Restatement (Third) of Trust § 90, cmt. b). *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan."). As the Ninth Circuit described, additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment

23

results over time because "[b]eneficiaries subject to higher fees . . . lose not only the money spent on higher fees, but also 'lost investment opportunity'; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

58.     Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement.  Although at all times 401(k) accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices of plan sponsors and fiduciaries, whether due to poor performance, high fees, or both.

59.     In fact, the Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices," among other duties.  *See* "*A Look at 401(k) Plan Fees*," *supra*.

60.     The duty to evaluate and monitor fees and investment costs includes fees paid directly by plan participants to investment providers, usually in the form of an expense ratio or a percentage of assets under management within a particular

investment.  *See* Investment Company Institute ("ICI"), *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses*, (July 2016), at 4.  "Any costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, are, effectively, paid by plan participants."  *Id*. at 5.

61.   The fiduciary task of evaluating investments and investigating comparable alternatives in the marketplace is made much simpler by the advent of independent research from companies like Morningstar, which sorts mutual funds of all kinds into categories "based on the underlying securities in each portfolio. . . .  We place funds in a given category based on their portfolio statistics and compositions over the past three years."  *See* http://www.morningstar.com/InvGlossary/morningstar_category.aspx.[8]

62.   On average, there are lower expense ratios for 401(k) participants than those for other investors.  *See The Economics of Providing 401(k) Plans*, at 11.

---

[8] As described by Morningstar, these categories "were introduced in 1996 to help investors make meaningful comparisons between mutual funds.  Morningstar found that the investment objective listed in a fund's prospectus often did not adequately explain how the fund actually invested…[we] solved this problem by breaking portfolios into peer groups based on their holdings.  The categories help investors identify the top performing funds, assess potential risk, and build well-diversified portfolios."  *See The Morningstar Category Classifications* (June 30, 2016), at 7.  These categories are assigned to mutual funds, variable annuities, and separate accounts.  *Id.*

ERISA-mandated monitoring of investments leads prudent and impartial plan sponsors to continually evaluate performance and fees, resulting in great competition among mutual funds in the marketplace. Furthermore, the large average account balances of 401(k) plans, especially the largest ones as measured by assets managed, lead to economies of scale and special pricing within mutual funds. *See id* at 10.

63.     This has led to falling mutual fund expense ratios for 401(k) plan participants since 2000. In fact, these expense ratios fell 31 percent from 2000 to 2015 for equity funds, 25 percent for hybrid funds, and 38 percent for bond funds. *See id*. at 1.

64.     The most recent comprehensive average mutual fund expense data for plans of different sizes is from 2012, and industry analysts have recognized a marked trend toward lower fees in 401(k)s over the past four years. *See* Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*, WALL STREET JOURNAL (May 15, 2016), available at http://www.wsj.com/articles/401-k-fees-already-low-are-heading-lower-1463304601 (noting precipitous drop in overall 401(k) fees from 2012 to 2014).

65.     The following figure published by the ICI best illustrates that 401(k) plans on average pay far lower fees than regular industry investors, even as expense ratios for all investors continued to drop for the past several years.[9]

FIGURE 7

**Average Total Mutual Fund Expense Ratios**
*Percent, 2013–2015*

| | 2013 | | 2014 | | 2015 | |
|---|---|---|---|---|---|---|
| | Industry[1] | 401(k)[2] | Industry[1] | 401(k)[2] | Industry[1] | 401(k)[2] |
| **Equity funds** | **0.74** | **0.58** | **0.70** | **0.54** | **0.68** | **0.53** |
| Domestic | 0.67 | 0.54 | 0.64 | 0.50 | 0.62 | 0.51 |
| World | 0.90 | 0.73 | 0.86 | 0.67 | 0.82 | 0.62 |
| **Hybrid funds** | **0.80** | **0.57** | **0.78** | **0.55** | **0.77** | **0.54** |
| **Bond funds** | **0.61** | **0.48** | **0.57** | **0.43** | **0.54** | **0.38** |
| High-yield and world | 0.83 | 0.79 | 0.78 | 0.65 | 0.74 | 0.56 |
| Other | 0.51 | 0.44 | 0.48 | 0.40 | 0.46 | 0.35 |
| **Money market funds** | **0.17** | **0.19** | **0.13** | **0.16** | **0.14** | **0.16** |

[1] The industry average expense ratio is measured as an asset-weighted average.
[2] The 401(k) average expense ratio is measured as a 401(k) asset-weighted average.
Note: Data exclude mutual funds available as investment choices in variable annuities and tax-exempt mutual funds.
Sources: Investment Company Institute and Lipper

*Id.* at 12.

66.     Prudent and impartial plan sponsors thus should be monitoring both the performance and cost of the investments selected for their 401(k) plans, as well as

---

[9] This chart does not account for the strategy of a mutual fund, which may be to mirror an index, a so-called passive management strategy, or may attempt to "beat the market" with more aggressive investment strategies via active management. Active management funds tend to have significantly higher expense ratios compared to passively managed funds because they require a higher degree of research and monitoring than funds which merely attempt to replicate a particular segment of the market.

investigating alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants.

### 1.   Passively Managed Funds Cost Less Than Actively Managed Funds

67.    ERISA is derived from trust law. *Tibble*, 135 S. Ct. at 1828. (2015). Accordingly, the Supreme Court has stated that where ERISA is silent, courts should seek guidance from trust law. *Varity Corp v. Howe*, 516 U.S. 489, 496-97 (1996). One such area is the selection of appropriate funds for a plan. Trust law states it depends on "the type of trustee and the nature of the breach involved, the availability of relevant data, and other facts and circumstances of the case." Restatement (Third) of Trusts § 100 cmt. b(1). To determine whether a fiduciary has selected appropriate funds for the trust, appropriate comparators may include "return rates of one or more suitable common trust funds, or suitable index mutual funds or market indexes (with such adjustments as may be appropriate)." *Id.*

68.    In this action, each investment option within the Plan charged certain fees, to be paid by deductions from the pool of assets under management. For passively managed funds, which are designed to mimic a market index such as Standard & Poor's 500, securities were purchased to match the mix of companies within the index. Because they are simply a mirror of an index, these funds offer both diversity of investment and comparatively low fees.

69.     By contrast, actively managed funds, which have a mix of securities selected in the belief they will beat the market, have higher fees, to account for the work of the investment managers of such funds and their associates.

70.     While higher-cost mutual funds may outperform a less-expensive option, such as a passively-managed index fund, over the short term, they rarely do so over a longer term.  *See* Jonnelle Marte, *Do Any Mutual Funds Ever Beat the Market?       Hardly*,       The       Washington       Post,       available       at https://www.washingtonpost.com/news/get-there/wp/2015/03/17/do-any-mutual-funds-ever-beat-the-market-hardly/ (citing a study by S&P Dow Jones Indices which looked at 2,862 actively managed mutual funds, focused on the top quartile in performance and found most did not replicate performance from year to year); *see also Index funds trounce actively managed funds: Study*, available at http://www.cnbc.com/2015/06/26/index-funds-trounce-actively-managed-funds-study.html (long-term data suggests that actively managed funds "lagged their passive counterparts across nearly all asset classes, especially over a 10-year period from 2004 to 2014.")

71.     Indeed, funds with high fees on average perform worse than less expensive funds, even on a pre-fee basis.  Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J.

Econ. Behav. & Org. 871, 873 (2009) (hereinafter "*When Cheaper is Better*"); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. Pa. L. Rev. 1961, 1967-75 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

### 2.     <u>Institutional Share Classes Cost Less Than Investor Share Classes</u>

72.     Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors.  Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower cost shares are targeted at institutional investors with more assets, generally $1 million or more, and therefore greater bargaining power.  There is no difference between share classes other than cost—the funds hold identical investments and have the same manager.

73.     Large defined contribution plans such as the Plan have sufficient assets to qualify for the lowest cost share class available.  Even when a plan does not yet meet the investment minimum to qualify for the cheapest available share class, it is well-known among institutional investors that mutual fund companies will typically waive those investment minimums for a large plan adding the fund in question to the plan as a designated investment alternative.  Simply put, a fiduciary to a large defined contribution plan such as the Plan can use its asset size and negotiating power to

invest in the cheapest share class available.  For this reason, prudent retirement plan fiduciaries will search for and select the lowest-priced share class available.

74.  One recent article written by the head of a fiduciary consulting firm described the failure to investigate the availability of and subsequently utilize the lowest-cost share class as an "egregious fiduciary breach[]" that is responsible for "[w]asting plan assets" in a manner that is "clearly imprudent." Blaine Aikin (exec. chairman of fi360 Inc.), *Recent Class-Action Surge Ups the Ante for 401(k) Advice*, INVESTMENTNEWS (Feb. 18, 2016), available at https://www.investmentnews.com/recent-class-action-surge-ups-the-ante-for-401k-advice-66056.  Indeed, recently a court observed that "[b]ecause the institutional share classes are otherwise *identical* to the retail share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary.  Thus, the 'manner that is reasonable and appropriate to the particular investment action, and strategies involved' . . . in this case would mandate a prudent fiduciary—who indisputably has knowledge of institutional share classes and that such share classes provide identical investments at lower costs—to switch share classes immediately." *Tibble, et al. v. Edison Int. et al.*, No. 07-5359, slip op. at 13 (C.D. Cal. Aug. 16, 2017).

75.     This claim is not about the use of "retail mutual funds" versus the use of "institutional mutual funds."  Retail mutual funds are perfectly acceptable and prudent choices under certain circumstances.  In some instances, a mutual fund company may only offer retail mutual funds.  Or, in other instances, the mutual fund company might restrict institutional share classes in such a manner that would make it impossible to utilize the mutual funds.  This claim is instead about utilizing the lowest-cost class of shares that is available to the Plan.

### 3.     Collective Trusts and Separate Accounts Cost Less Than Their Virtually Identical Mutual Fund Counterparts

76.     The investment options offered within the Plan were mostly pooled investment products known as mutual funds.  Throughout the Class Period, the investment options available to participants were almost exclusively mutual funds.

77.     Plan fiduciaries such as Defendants here must be continually mindful of investment options to ensure they do not unduly risk plan participants' savings and do not charge unreasonable fees.  Some of the best investment vehicles for these goals are collective trusts, which pool plan participants' investments further and provide lower fee alternatives to even institutional and 401(k) plan specific shares of mutual funds.  As noted *supra*, trust law specifically identifies "one or more suitable common trust funds" as a comparator to determine whether a trust is invested in suitable investments.  Restatement (Third) of Trusts § 100 cmt. b(1).

78.     Collective trusts are administered by banks or trust companies, which assemble a mix of assets such as stocks, bonds and cash.  Regulated by the Office of the Comptroller of the Currency rather than the Securities and Exchange Commission, collective trusts have simple disclosure requirements, and cannot advertise nor issue formal prospectuses.  As a result, their costs are much lower, with less or no administrative costs, and less or no marketing or advertising costs.  *See* Powell, Robert, "Not Your Normal Nest Egg," The Wall Street Journal, March 2013, available                       at                       http://www.wsj.com/articles/ SB10001424127887324296604578177291881550144.

79.     Due to their potential to reduce overall plan costs, collective trusts are becoming increasingly popular; *Use of CITs in DC Plans Booming* (discussing data showing that among both mid-size and large defined contribution plans, significantly more assets are held in collective trusts than in mutual funds).[10]

---

[10] The criticisms that have been launched against collective trust vehicles in the past no longer apply.  Collective trusts use a unitized structure and the units are valued daily; as a result, participants invested in collective trusts are able to track the daily performance of their investments online.  *Use of CITs in DC Plans Booming*; Paula Aven Gladych, *CITs Gaining Ground in 401(k) Plans*, EMPLOYEE BENEFIT NEWS (Apr. 14, 2016), available at http://www.benefitnews.com/news/cits-gaining-ground-in-401-k-plans (hereinafter CITs Gaining Ground).  Many if not most mutual fund strategies are available in collective trust format, and the investments in the collective trusts are identical to those held by the mutual fund.  *Use of CITs in DC Plans Booming; CITs Gaining Ground*.  And because collective trusts contract

80.    Thus, a prudent fiduciary managing a large plan will give serious consideration to the use of separate accounts or collective trusts, and in the majority of cases, will opt to move out of mutual funds.

81.    Separate accounts are another type of investment vehicle similar to collective trusts, which retain their ability to assemble a mix of stocks, bonds, real property, and cash, and their lower administrative costs.

82.    Separate accounts are widely available to large plans such as the Plan, and offer a number of advantages over mutual funds, including the ability to negotiate fees. Costs within separate accounts are typically much lower than even the lowest-cost share class of a particular mutual fund. By using separate accounts, "[t]otal investment management expenses can commonly be reduced to one-fourth of the expenses incurred through retail mutual funds." U.S. Dep't of Labor, *Study of 401(k) Plan Fees and Expenses*, at 17 (April 13, 1998), available at

---

directly with the plan, and provide regular reports regarding costs and investment holdings, the Plan has the same level of protection that the Investment Company Act provides to individual investors, thus eliminating the need for the protections of the Investment Company Act. Further, collective trusts are still subject to state and federal banking regulations that provide comparable protections. American Bankers Association, ABA Primer on Bank Collective Funds, June 2015, at 1, available at https://www.aba.com/advocacy/policy-analysis/primer-bank-collective-investment-funds

https://www.dol.gov/sites/dolgov/files/EBSA/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf

**B.** **Defendants Breached Their Fiduciary Duties in Failing to Investigate and Select Lower Cost Alternative Funds**

83.     The Supreme Court recently reaffirmed the ongoing fiduciary duty to monitor a plan's investment options in *Tibble*, 135 S. Ct. at 1823.  In *Tibble*, the Court held that "an ERISA fiduciary's duty is 'derived from the common law of trusts,'" and that "[u]nder trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones."  *Id.* at 1828.  In so holding, the Supreme Court referenced with approval the Uniform Prudent Investor Act, treatises, and seminal decisions confirming the duty.

84.     Under trust law, one of the responsibilities of the Plan's fiduciaries is to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs." Restatement (Third) of Trusts ch. 17, intro. note (2007); *see also* Restatement (Third) of Trusts § 90 cmt. B (2007) ("Cost-conscious management is fundamental to prudence in the investment function.").  Adherence to these duties requires regular performance of an "adequate investigation" of existing investments in a plan to determine whether any of the plan's investments are "improvident," or if there is a "superior alternative investment" to any of the plan's holdings.  *Pension Ben. Gaur.*

*Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 718-19 (2d Cir. 2013).

85.     When large plans, like the Plan here, have options which approach the retail cost of shares for individual investors or are simply more expensive than the average institutional shares for that type of investment, a careful review of the plan and each option is needed for the fiduciaries to fulfill their obligations to the plan participants.

86.     The Plan has retained several actively-managed funds as Plan investment options despite the fact that these funds charged grossly excessive fees compared with comparable or superior alternatives, and despite ample evidence available to a reasonable fiduciary that these funds had become imprudent due to their high costs.

87.     During the Class Period, the Plan lost millions of dollars in offering investment options that had similar or identical characteristics to other lower-priced investment options.

88.     Upon information and belief, the majority of funds in the Plan stayed the same during the Class Period. Taking 2018 as an example year, 16 out of 29 funds in the Plan—that is, 55% of funds—were much more expensive than comparable

funds found in similarly-sized plans (plans having $100m to $250m in assets).[11]  The

expense ratios for funds in the Plan in some cases were up to *72%* above the median

expense ratios in the same category:

| Fund | ER[12] | Category | ICI Median Fee[13] |
|---|---|---|---|
| BNY Mellon Instl S&P 500 Stk Idx I | 0.20% | Index | .08% |
| Eaton Vance Atlanta Capital SMID-Cap I | 0.91% | Domestic Equity | 0.61% |
| Fidelity Advisor New Insights I | 0.79% | Domestic Equity | 0.61% |
| PIMCO Income Instl | 0.74% | Domestic Bond | 0.45% |
| Invesco Oppenheimer International Gr Y | 0.85% | Int'l Equity | 0.70% |
| Janus Henderson Triton I | 0.75% | Domestic Equity | 0.61% |
| Invesco Oppenheimer Developing Markets Y | 1.01% | Int'l Equity | 0.70% |

---

[11] *See* BrightScope/ICI Defined Contribution Plan Profile: *A Close Look at 401(k) Plans, 2015* at 69 (March 2018) (defined above as "ICI Study"), *available at* https://www.ici.org/pdf/ppr_18_dcplan_profile_401k.pdf

[12]  The listed expense figures are taken from the most recent summary prospectuses published in 2020.

[13] This median fee is taken from plans with between $100m and $250m.

| | | | |
|---|---|---|---|
| Victory Sycamore Established Value A | 0.89% | Domestic Equity | 0.61% |
| Fidelity Advisor Real Estate I | 0.82% | Domestic Equity | 0.61% |
| PGIM QMA Small-Cap Value Z | 0.69% | Domestic Equity | 0.61% |
| Templeton Foreign A | 1.10% | Int'l Equity | 0.70% |
| Western Asset Core Bond A | 0.82% | Domestic Bond | 0.45% |
| BlackRock Inflation Protected Bond Inv A | 0.75% | Domestic Bond | 0.45% |
| Victory INCORE Fund for Income A | 0.91% | Domestic Bond | 0.45% |
| BlackRock High Yield Bond Instl | 0.61% | Domestic Bond | 0.45% |
| PIMCO CommoditiesPLUS Strategy A | 1.22% | Other | 0.88% |

89.     The above comparisons understate the excessiveness of fees in the Plan throughout the Class Period.  That is because the ICI study was conducted in 2015 when expense ratios would have been higher than today given the downward trend of expense ratios the last few years.  Accordingly, the median expense ratios in 2020 utilized by similar plans would be lower than indicated above, demonstrating a

greater disparity between the 2020 expense ratios utilized in the above chart and the median expense ratios.

90.    Further, median-based comparisons also understate the excessiveness of the investment management fees of the Plan funds because many prudent alternative funds were available that offered lower expenses than the median.

91.    As demonstrated by the chart below, in several instances during the Class Period, Defendant failed to prudently monitor the Plan to determine whether the Plan was invested in the lowest-cost share class available for the Plan's mutual funds, which are identical to the mutual funds in the Plan in every way except for their lower cost.

92.    From 2016 through November 2019 the target date funds in the Plan were Wilmington Trust collective trust versions of Blackrock LifePath Index Retirement Funds.  The Plan's Form 5500 lists both classes (75 and 95) of the Wilmington Trust Funds and fails to identify whether both classes were utilized during the Class Period or if one or the other class was utilized.  For that reason, the below charts depict the expenses for both classes.  The Plan could have obtained the exact same fund directly from BlackRock for .15% and .11%, respectively, a fraction of the cost of the Wilmington Trust versions:

| Plan Fund | ER | Alternate Fund | Alternate ER |
|---|---|---|---|
| Wilmington Trust BlackRock Lifepath Index 2030 Class 75 | 0.51 % | BlackRock LifePath Index 2030 I | 0.15% |
| Wilmington Trust BlackRock Lifepath Index 2025 Class 75 | 0.51 % | BlackRock LifePath Index 2025 I | 0.15% |
| Wilmington Trust BlackRock Lifepath Index 2020 Class 75 | 0.51 % | BlackRock LifePath Index 2020 I | 0.15% |
| Wilmington Trust BlackRock Lifepath Index 2035 Class 75 | 0.51 % | BlackRock LifePath Index 2035 I | 0.15% |
| Wilmington Trust BlackRock Lifepath Index 2040 Class 75 | 0.51 % | BlackRock LifePath Index 2040 I | 0.15% |
| Wilmington Trust BlackRock Lifepath Index 2050 Class 75 | 0.51 % | BlackRock LifePath Index 2050 I | 0.15% |
| Wilmington Trust BlackRock Lifepath Index Retirement Fund Class 75 | 0.51 % | BlackRock LifePath Index Retire I | 0.15% |
| Wilmington Trust BlackRock Lifepath Index 2045 Class 75 | 0.51 % | BlackRock LifePath Index 2045 I | 0.15% |
| Wilmington Trust BlackRock Lifepath Index 2055 Class 75 | 0.51 % | BlackRock LifePath Index 2055 I | 0.15% |
| Wilmington Trust BlackRock Lifepath Index 2060 Class 75 | 0.51 % | BlackRock LifePath Index 2060 I | 0.15% |

Class 95:

| Plan Fund | ER | Alternate Fund | ER |
|---|---|---|---|
| Wilmington Trust BlackRock Lifepath Index 2030 Class 95 | 0.71% | Wilmington Trust BlackRock Lifepath Index 2030 Class 35 | 0.11% |
| Wilmington Trust BlackRock Lifepath Index 2025 Class 95 | 0.71% | Wilmington Trust BlackRock Lifepath Index 2025 Class 35 | 0.11% |
| Wilmington Trust BlackRock Lifepath Index 2020 Class 95 | 0.71% | Wilmington Trust BlackRock Lifepath Index 2020 Class 35 | 0.11% |
| Wilmington Trust BlackRock Lifepath Index 2035 Class 95 | 0.71% | Wilmington Trust BlackRock Lifepath Index 2035 Class 35 | 0.11% |

| | | | |
|---|---|---|---|
| Wilmington Trust BlackRock Lifepath Index 2040 Class 95 | 0.71% | Wilmington Trust BlackRock Lifepath Index 2040 Class 35 | 0.11% |
| Wilmington Trust BlackRock Lifepath Index Retirement Fund Class 95 | 0.71% | Wilmington Trust BlackRock Lifepath Index Retirement Fund Class 35 | 0.11% |
| Wilmington Trust BlackRock Lifepath Index 2045 Class 95 | 0.71% | Wilmington Trust BlackRock Lifepath Index 2045 Class 35 | 0.11% |
| Wilmington Trust BlackRock Lifepath Index 2050 Class 95 | 0.71% | Wilmington Trust BlackRock Lifepath Index 2050 Class 35 | 0.11% |
| Wilmington Trust BlackRock Lifepath Index 2055 Class 95 | 0.71% | Wilmington Trust BlackRock Lifepath Index 2055 Class 35 | 0.11% |
| Wilmington Trust BlackRock Lifepath Index 2060 Class 95 | 0.71% | Wilmington Trust BlackRock Lifepath Index 2060 Class 35 | 0.11% |

93.     There is no good-faith explanation for utilizing high-cost share classes when lower-cost share classes are available for the exact same investment.  The Plan did not receive any additional services or benefits based on its use of more expensive share classes; the only consequence was higher costs for Plan participants.

94.     Even the Wilmington Trust collective trust versions of the BlackRock Mutual funds utilized by the Plan was not in the lowest share class available to the Plan.  Additionally, the remaining funds in the Plan also had identical lower share counterparts that were never selected by the Plan's fiduciaries.  Using 2020 expense

ratios, the most recent data available, the chart below demonstrates how much more

expensive the share classes in the Plan were than available lower share classes.

| Fund in Plan[14] | 2020 Exp. Ratio | Lower Cost Share Class | 2020 Exp. Ratio | % Fee Excess |
|---|---|---|---|---|
| Wilmington Trust BlackRock Lifepath Index 2030 Class 75 | 0.51% | Wilmington Trust BlackRock Lifepath Index 2030 Class 35 | 0.11% | 363.6% |
| Wilmington Trust BlackRock Lifepath Index 2030 Class 95 | 0.71% | | | 545.5% |
| Wilmington Trust BlackRock Lifepath Index 2025 Class 75 | 0.51% | Wilmington Trust BlackRock Lifepath Index 2025 Class 35 | 0.11% | 363.6% |
| Wilmington Trust BlackRock Lifepath Index 2025 Class 95 | 0.71% | | | 545.5% |
| Wilmington Trust BlackRock Lifepath Index 2020 Class 75 | 0.51% | Wilmington Trust BlackRock Lifepath Index 2020 Class 35 | 0.11% | 363.6% |
| Wilmington Trust BlackRock Lifepath Index 2020 Class 95 | 0.71% | | | 545.5% |
| Wilmington Trust BlackRock Lifepath Index 2035 Class 75 | 0.51% | Wilmington Trust BlackRock Lifepath Index 2035 Class 35 | 0.11% | 363.6% |
| Wilmington Trust BlackRock | 0.71% | | | 545.5% |

---

[14] As noted above, the Plan's Form 5500 lists both classes (75 and 95) of the Wilmington Trust BlackRock Lifepath target date funds. The Form 5500 fails to clearly identify whether both classes were utilized during the Class Period or if one or the other share class was utilized.  Accordingly, where appropriate, each cell in this column references both the Class 75 target date shares (identified first) and the Class 95 target dates shares (identified second).

| | | | |
|---|---|---|---|
| Lifepath Index 2035 Class 95 | | | |
| Wilmington Trust BlackRock Lifepath Index 2040 Class 75 | 0.51% | Wilmington Trust BlackRock Lifepath Index 2040 Class 35 | 363.6% |
| Wilmington Trust BlackRock Lifepath Index 2040 Class 95 | 0.71% | 0.11% | 545.5% |
| Wilmington Trust BlackRock Lifepath Index Retirement Fund Class 75 | 0.51% | Wilmington Trust BlackRock Lifepath Index Retirement Fund Class 35 | 363.6% |
| Wilmington Trust BlackRock Lifepath Index Retirement Fund Class 95 | 0.71% | 0.11% | 545.5% |
| Wilmington Trust BlackRock Lifepath Index 2045 Class 75 | 0.51% | Wilmington Trust BlackRock Lifepath Index 2045 Class 35 | 363.6% |
| Wilmington Trust BlackRock Lifepath Index 2045 Class 95 | 0.71% | 0.11% | 545.5% |
| Wilmington Trust BlackRock Lifepath Index 2050 Class 75 | 0.51% | Wilmington Trust BlackRock Lifepath Index 2050 Class 35 | 363.6% |
| Wilmington Trust BlackRock Lifepath Index 2050 Class 95 | 0.71% | 0.11% | 545.5% |
| Wilmington Trust BlackRock Lifepath Index 2055 Class 75 | 0.51% | Wilmington Trust BlackRock Lifepath Index 2055 Class 35 | 363.6% |
| Wilmington Trust BlackRock Lifepath Index 2055 Class 95 | 0.71% | .11% | 545.5% |
| Wilmington Trust BlackRock Lifepath Index 2060 Class 75 | 0.51% | Wilmington Trust BlackRock Lifepath Index 2060 Class 35 | 363.6% |
| Wilmington Trust BlackRock Lifepath Index 2060 Class 95 | 0.71% | .11% | 545.5% |

| | | | | |
|---|---|---|---|---|
| Eaton Vance Atlanta Capital SMID-Cap I | 0.91% | Eaton Vance Atlanta Capital SMID-Cap R6 | 0.82% | 11% |
| JPMorgan Intrepid Value I | 0.59% | JPMorgan Intrepid Value R6 | 0.34% | 73.5% |
| Invesco Oppenheimer International Gr Y | 0.85% | Invesco Oppenheimer International Gr R6 | 0.67% | 26.9% |
| Janus Henderson Triton I | .75% | Janus Henderson Triton N | 0.66% | 13.6% |
| Invesco Oppenheimer Developing Markets Y | 1.01% | Invesco Oppenheimer Developing Markets R6 | 0.85% | 18.8% |
| Victory Sycamore Established Value A | 0.89% | Victory Sycamore Established Value R6 | 0.57% | 56.14% |
| PGIM QMA Small-Cap Value Z | 0.69% | PGIM QMA Small-Cap Value R6 | 0.63% | 9.5% |
| Templeton Foreign A | 1.10% | Templeton Foreign R6 | 0.69% | 59.4% |
| Western Asset Core Bond A | 0.82% | Western Asset Core Bond IS | 0.42% | 95.2% |
| BlackRock Inflation Protected Bond Inv A | 0.75% | BlackRock Inflation Protected Bond Inv K | 0.45% | 66.7% |
| Victory INCORE Fund for Income A | 0.91% | Victory INCORE Fund for Income R6 | 0.63% | 44.4% |
| BlackRock High Yield Bond Instl | 0.61% | BlackRock High Yield Bond K | 0.50% | 22.0% |

95.    The above is for illustrative purposes only.  At all times during the Class Period, Defendants knew or should have known of the existence of cheaper share classes and therefore also should have immediately identified the prudence of transferring the Plan's funds into these alternative investments.

96.    Upon information and belief, all the lower share classes identified above were available to the Plan.  Taking 2018 as an exemplar year, the Plan would have qualified for lower share classes for an overwhelming majority of its investment funds given the assets under management for each fund:

| Fund | Category | AUM |
|---|---|---|
| WT BlackRock LifePath Index 2030 | Target Date | $25,761,935 |
| WT BlackRock LifePath Index 2025 | Target Date | $ 24,009,235 |
| WT BlackRock LifePath Index 2020 | Target Date | $16,952,976 |
| WT BlackRock LifePath Index 2035 | Target Date | $16,814,686 |
| WT BlackRock LifePath Index 2040 | Target Date | $12,678,776 |
| BNY Mellon Instl S&P 500 Stk Idx I | Target Date | $9,301,871 |
| WT BlackRock LifePath Index Retire | Target Date | $8,393,296 |

| | | |
|---|---|---|
| WT BlackRock LifePath Index 2045 | Target Date | $7,962,381 |
| Fidelity Advisor Stable Value Portfolio Class | Domestic Equity | $6,462,288 |
| Eaton Vance Atlanta Capital SMID-Cap I | Domestic Equity | $5,541,312 |
| Fidelity Advisor New Insights I | Domestic Equity | $5,514,805 |
| WT BlackRock LifePath Index 2050 | Target Date | $4,977,265 |
| PIMCO Income Instl | Domestic Bond | $4,867,973 |
| JPMorgan Intrepid Value I | Domestic Equity | $3,911,852 |
| WT BlackRock Lifepath Index 2055 | | $2,795,252 |
| Invesco Oppenheimer International Gr Y | Int'l Equity | $2,406,252 |
| Janus Henderson Triton I | Domestic Equity | $2,268,251 |
| Invesco Oppenheimer Developing Markets Y | Int'l Equity | $1,552,856 |
| Victory Sycamore Established Value A/I | Domestic Equity | $1,541,293 |
| Fidelity Advisor Real Estate I | Domestic Equity | $1,154,664 |
| PGIM QMA Small-Cap Value Z | Domestic Equity | $922,106 |

| | | |
|---|---|---|
| Templeton Foreign A | Int'l Equity | $911,933 |
| Western Asset Core Bond A | Domestic Bond | $880,135 |
| BlackRock Inflation Protected Bond Inv A | Domestic Bond | $779,682 |
| Victory INCORE Fund for Income A | Domestic Bond | $660,332 |
| WT BlackRock Lifepath Index 2060 | Target Date | $659,064 |
| BlackRock High Yield Bond Instl | Domestic Bond | $645,938 |
| PIMCO CommoditiesPLUS Strategy A | Other | $165,440 |

97.    A prudent fiduciary conducting an impartial review of the Plan's investments would have identified the cheaper share classes available and transferred the Plan's investments in the above-referenced funds into the cheaper share classes at the earliest opportunity.

98.    In summary, Defendants could have used the Plan's bargaining power to obtain high-quality, low-cost alternatives to mutual funds, in order to negotiate the best possible price for the Plan.  By failing to investigate the use of lower cost share classes, Defendants caused the Plan to pay millions of dollars per year in unnecessary fees.

99.    Defendants also failed to consider materially similar but cheaper alternatives to the Plan's investment options.  The chart below demonstrates that the expense ratios of the Plan's investment options were more expensive by multiples of comparable passively-managed and actively-managed alternative funds in the same investment style.  A reasonable investigation would have revealed the existence of these lower-cost alternatives.  The chart below uses 2020 expense ratios, the most recent data available, as a methodology to demonstrate how much more expensive the Plan's funds were than their alternative fund counterparts:

| Fund in Plan | 2020 Exp. Ratio | Passive/Active Lower Cost Alternative[15] | 2020 Exp. Ratio | % Fee Excess |
|---|---|---|---|---|
| Eaton Vance Atlanta Capital SMID-Cap I | 0.91 % | Vanguard Mid-Cap Growth Index Admiral | 0.07% | 1200% |
| | | Vanguard Mid-cap Growth | 0.36% | 152.78% |
| | | | | |
| Fidelity Advisor New Insights I | 0.79 % | Vanguard Russell 1000 Growth Index I | 0.08% | 887.5% |
| | | Vanguard Equity Income | 0.27% | 192.59% |
| | | | | |
| PIMCO Income Instl | 0.74 % | BlackRock Credit Strategies Income Instl | 0.63% | 17.46% |
| | | No Index version | | |
| | | | | |
| JPMorgan Intrepid Value I | 0.59 % | Vanguard Value Index I | 0.04 % | 1375% |
| | | Vanguard Equity Income | 0.22 % | 168% |
| | | | | |

---

[15] Where appropriate, each cell in this column references both a passively-managed fund (identified first) and an actively-managed fund (identified second).

| Invesco Oppenheimer International Gr Y | 0.85 % | Vanguard Intl Div Apprec Idx Adm | 0.25% | 240% |
|---|---|---|---|---|
| | | Vanguard Intl Growth Adm | 0.32% | 165.63% |
| | | | | |
| Janus Henderson Triton I | 0.75 % | Vanguard Small Cap Growth Index I | 0.06% | 1150% |
| | | Vanguard Explorer | 0.46% | 63% |
| | | | | |
| Invesco Oppenheimer Developing Markets Y | 1.01 % | Fidelity Emerging Markets Idx | 0.08 % | 1162.5% |
| | | DFA Emerging Markets Core Equity I | 0.52 % | 94.23% |
| | | | | |
| Victory Sycamore Established Value A | 0.89 % | Vanguard Mid-Cap Value Index Admiral | 0.07% | 1171% |
| | | Vanguard Capital Value | 0.29% | 206.9% |
| | | | | |
| Fidelity Advisor Real Estate I | 0.82 % | Fidelity Real Estate Securities Index | 0.07% | 1071% |
| | | DFA Real Estate Securities I | 0.18% | 355.5% |
| | | | | |
| PGIM QMA Small-Cap Value Z | 0.69 % | Vanguard Small Cap Value Index Admiral | 0.07% | 885.71% |
| | | Vanguard Explorer Value | 0.56% | 23.2% |
| | | | | |
| Templeton Foreign A | 1.10 % | Fidelity International Enhanced Index | 0.59% | 86.4% |
| | | Vanguard Int'l Value | 0.38% | 189.4% |
| | | | | |
| Western Asset Core Bond A | 0.82 % | Fidelity® US Bond Index | 0.03 % | 2633% |
| | | Vanguard Core Bond Admiral | 0.13 % | 530% |
| | | | | |
| BlackRock Inflation Protected Bond Inv A | 0.75 % | Fidelity® Inflation-Protected Bd Index | 0.05% | 1400% |
| | | Vanguard Inflation-protected Securities I | 0.07% | 971.4% |
| | | | | |

| Victory INCORE Fund for Income A | 0.91 % | Vanguard Short-Term Treasury Idx Admiral | 0.07% | 1200% |
| | | Vanguard Short-Term Federal | 0.20% | 355% |
| | | | | |
| BlackRock High Yield Bond Instl | 0.61 % | Federated High-Yield Strategy | 0.03% | 1933% |
| | | | | |
| PIMCO CommoditiesPLUS Strategy A | 1.22 % | BlackRock Commodity Strategies Instl | 0.63% | 93.65% |

100.   The above is for illustrative purposes only as the significant fee disparities detailed above existed for all years of the Class Period.  The Plan expense ratios were multiples of what they should have been given the bargaining power available to the Plan fiduciaries.

101.   Moreover, the Plan's fiduciaries cannot justify selecting actively managed funds over passively managed ones.  As noted above, while higher-cost mutual funds may outperform a less-expensive option such as a passively-managed index fund over the short term, they rarely do so over a longer term.  Defendants' failure to investigate lower cost alternative investments (both actively and passively managed funds) during the Class Period cost the Plan and its participants millions of dollars.

**C.**     **Defendants Failed to Monitor or Control the Plan's Recordkeeping Expenses**

102.   The Plan's recordkeeper is Fidelity Investments.  SPD at 3.  The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper."  Beyond simple provision of account statements to participants, it is quite common for the recordkeeper to provide a broad range of services to a defined contribution plan as part of its package of services.  These services can include claims processing, trustee services, participant education, managed account services, participant loan processing, QDRO[16] processing, preparation of disclosures, self-directed brokerage accounts, investment consulting, and general consulting services.  Nearly all recordkeepers in the marketplace offer this range of services, and defined contribution plans have the ability to customize the package of services they receive and have the services priced accordingly.  Many of these services can be provided by recordkeepers at very little cost.  In fact, several of these services, such as managed account services, self-directed brokerage, QDRO processing, and loan processing are often a profit center for recordkeepers.

---

[16] Qualified Domestic Relations Order.

103.   The market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service.  As a result of such competition, vendors vigorously compete for business by offering the best price.

104.   On overage, administrative expenses—the largest of which, by far, is recordkeeping—make up 18% of total plan fees.  Investment Company Institute & Deloitte Consulting LLP, *Inside the Structure of Defined Contribution/401(k) Plan Fees, 2013*, at 17 (Aug. 2014), available at https://www.ici.org/pdf/rpt_14_dc_401k_fee_study.pdf.

105.   The cost of providing recordkeeping services depends on the number of participants in a plan.  Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee.  Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.

106.   Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both).  Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

107.   Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs.  *See Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) ("*Tussey II*") (holding that fiduciaries of a 401(k) plan "breach[] their fiduciary duties" when they "fail[] to monitor and control recordkeeping fees" incurred by the plan); *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011) (explaining that defined contribution plan fiduciaries have a "duty to ensure that [the recordkeeper's] fees [are] reasonable").  First, they must pay close attention to the recordkeeping fees being paid by the plan.  A prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

108.   Second, in order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify *all* fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.  To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable

levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

109.   Third, the plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available.  This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace.  More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans.  *George*, 641 F.3d 800; *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

110.   Defendant has wholly failed to prudently manage and control the Plan's recordkeeping costs by failing to undertake any of the aforementioned steps because, among other things, there is no evidence that the Defendant negotiated to lower recordkeeping costs given that the recordkeeping costs have *increased* during the Class Period.  Defendants caused the Plan to pay the following per participant recordkeeping costs during the Class Period:

| Year | No. of Participants | Direct Payment to Fidelity | Indirect Payment to Fidelity Through Revenue Sharing | Additional Revenue Sharing to Fidelity | P/P Cost |
|------|--------|--------|--------|--------|--------|
| 2018 | 5230 | $ 72,581.00 | $ 547,343.00 | $ 785,312.00 | $269 |
| 2017 | 4920 | $ 24,260.00 | $ 559,568.00 | $ 812,515.00 | $284 |
| 2016 | 4956 | $ (16,827.00) | $ 692,314.00 | NA | $136 |
| 2015 | 5337 | $ 30,226.00 | $ 333,418.00 | NA | $68 |
| 2014 | 4829 | $ 27,300.00 | $ 309,707.00 | NA | $70 |

111.    The total amount of recordkeeping fees paid throughout the Class Period on a per participant basis was astronomical, especially in 2017 and 2018 as indicated above.  According to data compiled in the 20th edition of the 401k Averages Book, for plans with 2,000 participants and $200 million in assets, the average recordkeeping/administration fee was $5 per participant.  *See* Pension Data Source, 401k Averages Book at 107 (20th ed. 2020) (data updated through September 30, 2019).[17]  Expressed as a range, $0 per participant is at the low end and $43 per participant is at the high end.  *Id.*  The Plan's recordkeeping costs were at all times *higher* than any other plan with a similar amount of assets under management.

112.    The figures cited by the 401k Averages book is borne out by a 1998 study conducted by the Department of Labor ("1998 DOL Study").  The study

---

[17] "Published since 1995, the *401k Averages Book* is the oldest, most recognized source for non-biased, comparative 401(k) average cost information."  *401k Averages Book* at 2.

reflected that as the number of participants grow, a plan can negotiate lower recordkeeping fees:[18]

| Number of Participants | Avg. Cost Per Participant |
|---|---|
| 200 | $42 |
| 500 | $37 |
| 1,000 | $34 |

113.   Given the general trend of decreasing recordkeeping fees, the above average costs per participants would be lower today as reflected in the latest edition of the *401k Averages Book*.  As plan size increases, so should the costs per participant. *See* 1998 DOL Study at 4.2.2 ("Basic per-participant administrative charges typically reflect minimum charges and sliding scales that substantially reduce per capita costs as plan size increases.")[19]

---

[18]    *See*    https://www.dol.gov/sites/dolgov/files/EBSA/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf

[19] Case law is in accord. *See*, *e.g.*, *Spano v. Boeing*, Case 06-743, Doc. 466, at 26 (S.D. Ill. Dec. 30, 2014) (plaintiffs' expert opined market rate of $37–$42, supported by defendants' consultant's stated market rate of $30.42–$45.42 and defendant obtaining fees of $32 after the class period); *Spano*, Doc. 562-2 (Jan 29, 2016) (declaration that Boeing's 401(k) plan recordkeeping fees have been $18 per participant for the past two years); *George v. Kraft Foods Global, Inc.*, 641 F.3d 786 (7th Cir. 2011) (plaintiffs' expert opined market rate of $20–$27 and plan paid record-keeper $43–$65); *Gordon v. Mass Mutual*, Case 13-30184, Doc. 107-2 at ¶ 10.4 (D.Mass. June 15, 2016) (401(k) fee settlement committing the Plan to pay not more than $35 per participant for recordkeeping).

114.   Here, the increase in the Plan's recordkeeping costs (as measured on a per participant basis) far out-paced the modest growth in the number of participants from the start of the Class Period until the present, indicating the Plan's fiduciaries failed to leverage the growing size of the Plan (by both participants and assets) to achieve lower per participant costs.

115.   Given the increase in size of the Plan's assets during the Class Period and total number of unique participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services that would have been provided by its recordkeeper to the Plan.

116.   A prudent fiduciary would have observed the excessive fees being paid to the recordkeeper and taken corrective action.  Defendants' failures to monitor and control recordkeeping compensation cost the Plan millions of dollars per year and constituted separate and independent breaches of the duties of loyalty and prudence.

### FIRST CLAIM FOR RELIEF
### Breaches of Fiduciary Duties of Loyalty and Prudence
### (Asserted against Cumulus)

117.   Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

118.   At all relevant times, the Company ("Prudence Defendant") was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that it exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

119.   As a fiduciary of the Plan, Cumulus was subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).  These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

120.   The Prudence Defendant breached these fiduciary duties in multiple respects as discussed throughout this Complaint.  It did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the interest of Plan participants.  Instead, the Prudence Defendant selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments.  The Prudence Defendant also failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan.  In addition, the Prudence Defendant failed to investigate separate accounts and/or collective trusts as alternatives to mutual funds, even though they generally provide

the same investment management services at a lower cost.  Likewise, the Prudence Defendant failed to monitor or control the grossly-excessive compensation paid for recordkeeping services.

121.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns.  Had Defendant complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

122.   Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendant is liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendant's breaches as set forth in their Prayer for Relief.

123.   Because the Plan Document speaks of the "Plan fiduciaries," SPD at 8, there are likely other Plan fiduciaries not named in this Complaint.  Accordingly, the Prudence Defendant knowingly participated in each breach of the other fiduciaries, knowing that such acts were a breach, enabled the other fiduciaries to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other fiduciaries and failed to make any reasonable and timely

effort under the circumstances to remedy the breaches.  Accordingly, the Company

is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## SECOND CLAIM FOR RELIEF
### Failure to Adequately Monitor Other Fiduciaries
### (Asserted against Cumulus)

124.   Plaintiffs re-allege and incorporate herein by reference all prior

allegations in this Complaint as if fully set forth herein.

125.   Cumulus (the "Monitoring Defendant") had the authority to appoint and

remove investment managers.

126.   In light of this authority, the Monitoring Defendant had a duty to

monitor any investment manager it appointed during the Class Period to ensure that

the investment managers were adequately performing their fiduciary obligations, and

to take prompt and effective action to protect the Plan in the event that the investment

managers were not fulfilling those duties.

127.   The Monitoring Defendant also had a duty to ensure that the investment

managers possessed the needed qualifications and experience to carry out their duties

(or used qualified advisors and service providers to fulfill their duties); had adequate

financial resources and information; maintained adequate records of the information

on which they based their decisions and analysis with respect to the Plan's

investments; and reported regularly to Cumulus.

128.   Cumulus breached its fiduciary monitoring duties by, among other things:

    (a)    Failing to monitor and evaluate the performance of any investment managers or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of any investment managers' imprudent actions and omissions;

    (b)    failing to monitor the processes by which Plan investments were evaluated, their failure to investigate the availability of lower-cost share classes, and their failure to investigate the availability of lower-cost separate account and collective trust vehicles; and

    (c)    failing to remove any investment managers whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, and caused the Plan to pay excessive recordkeeping fees, all to the detriment of the Plan and Plan participants' retirement savings.

129.   As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.  Had Cumulus complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

130.   Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Cumulus is liable to restore to the Plan all losses caused by their failure to adequately monitor any investment managers.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## JURY DEMAND

Plaintiffs demand a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.     A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.     Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.     A Declaration that the Defendant has breached its fiduciary duties under ERISA;

D.     An Order compelling the Defendant to make good to the Plan all losses to the Plan resulting from Defendant's breaches of its fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendant made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendant had fulfilled its fiduciary obligations;

E.     An order requiring the Company Defendant to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against Cumulus as necessary to effectuate said relief, and to prevent the Cumulus' unjust enrichment;

F.     Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.     An order enjoining Defendant from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.     Other equitable relief to redress Defendant's illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

I.     An award of pre-judgment interest;

J.     An award of costs pursuant to 29 U.S.C. § 1132(g);

K.     An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.      Such other and further relief as the Court deems equitable and just.

Respectfully submitted,

Dated: February 24, 2020                **JOHNSON FISTEL, LLP**

By:  *s/ Michael I. Fistel, Jr.*
        Michael I. Fistel, Jr.
        michaelf@johnsonfistel.com
        Georgia Bar No.: 262062
        William W. Stone
        williams@johnsonfistel.com
        Georgia Bar No.: 273907
        Mary Ellen Conner
        maryellenc@johnsonfistel.com
        Georgia Bar No.: 195077
        Adam J. Sunstrom
        adams@johnsonfistel.com
        Georgia Bar No.: 556579
        40 Powder Springs Street
        Marietta, GA 30064
        Telephone: (470) 632-6000
        Facsimile: (770) 200-3101

        **CAPOZZI ADLER, P.C.**
        Mark K. Gyandoh, Esquire
        PA Attorney ID #88587
        Donald R. Reavy, Esquire
        PA Attorney ID #82498
        2933 North Front Street
        Harrisburg, PA 17110
        Telephone: (717) 233-4101

        *Counsel for Plaintiffs and the*
        *Putative Class*